NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| LINDA WAGONER,<br><br>    Plaintiff,<br><br>v.<br><br>EVERHOME MORTGAGE INC., *et al.*,<br><br>    Defendants. | Civil Action No.: 17-8081 (JLL)<br><br>**OPINION** |

**LINARES**, Chief District Judge.

This matter comes before the Court by way of Defendant TIAA, FSB d/b/a EverBank f/k/a EverBank's Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 28), Defendants Federal Home Loan Mortgage Corp. and New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing's Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 31), and Defendant Ditech Financial LLC's Motion to Dismiss Plaintiff's First Amended Complaint. (ECF No. 33). All three of these Motions to Dismiss are brought pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiff has submitted a unified Opposition to said Motions (ECF No. 37), which all Defendants have separately replied to. (ECF Nos. 38, 39, 40). The Court decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, the Court grants the Motions to Dismiss.

## I. BACKGROUND[1]

### A. The Parties

Plaintiff, who is a New Jersey resident, brings this multi-count action in connection with her home mortgage. (*See generally* Plaintiff's First Amended Complaint, ECF No. 25 ("FAC") ¶ 3). The jurisdictional basis for this action is federal question jurisdiction, under 28 U.S.C. § 1331. (FAC ¶ 1). Defendant TIAA f/k/a EverBank ("TIAA") is a Florida corporation that regularly conducts business in the State of New Jersey. (FAC ¶¶ 5-6). Defendant Federal Home Loan Mortgage ("Freddie Mac") has a principal place of business in Virginia, while Defendant Ditech maintains its headquarters in Minnesota. (FAC ¶¶ 6-7). Both of these Defendants regularly conduct business in New Jersey. (Id.). Finally, Defendant New Penn is a Virginia limited liability company, that does business under the name Shellpoint Mortgage Servicing, and regularly conducts business in the State of New Jersey.

### B. Pertinent Facts

In 2006, Plaintiff obtained a home loan from non-party First Horizon Home Loan Corporation. (FAC ¶ 10). Plaintiff executed a mortgage and note in connection with said home loan. (Id.). At some unknown point, Plaintiff defaulted on the loan. (FAC ¶ 11). Thereafter, Plaintiff's laon was serviced by Defendant TIAA. (FAC ¶ 12). During this time, Defendant Freddie Mac was the owner of the loan. (FAC ¶ 13).

In an effort to keep her home, Plaintiff applied for a loan modification through Defendant TIAA. (FAC ¶ 14). Defendants TIAA and Freddie Mac approved Plaintiff's loan modification application, and placed Plaintiff on a "Trial Period Plan," which was to start on June 1, 2009. (FAC ¶ 15). Plaintiff consented to the terms of the Trial Period Plan and signed an agreement to

---

[1] This background is derived from Plaintiff's First Amended Complaint, which the Court must accept as true at this stage of the proceedings. *See Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 758 (3d Cir. 2009).

2

that effect. (FAC ¶16). Under said agreement, Plaintiff was required to make three consecutive payments in the amount of $1,265.84 on or before June 1, 2009, July 1, 2009, and August 1, 2009. (FAC ¶ 17). Successfully making these three payments under the agreement would result in a complete approval of the loan modification application. (FAC ¶ 18). Plaintiff made the three consecutive payments. (FAC ¶ 19). Despite making said payments, Plaintiff never received a loan modification agreement. (FAC ¶ 20). According to Defendant TIAA, the loan modification was being delayed by the underwriting process. (FAC ¶ 21). Plaintiff continued to make payments of $1,265.84 on a monthly basis and paid her mortgage through January 1, 2010. (FAC ¶ 23).

On December 11, 2009, Plaintiff finally received her permanent loan modification offer. (FAC ¶ 24). The modification offer stated that it was set to begin on November 1, 2009 and the first payment under the new loan was due on December 1, 2009. (FAC ¶ 25). Plaintiff accepted the offer by executing permanent loan documents. (FAC ¶ 26). Plaintiff's payments for the first year of the new loan were $1,265.84 per month. (FAC ¶ 28). Plaintiff's payments increased to $1,289.78 per month in April of 2010. (FAC ¶ 29). In April of 2011, Plaintiff's payments increased again and the monthly payments became $1,333.18. (FAC ¶ 30). Plaintiff presumed that the increase was normal due to an increase in her annual property taxes. (Id.).

In 2012, Plaintiff's payments decreased to $1,266.14. (FAC ¶ 31). This reduction concerned Plaintiff, as she was aware that her taxes had recently increased. (Id.). The reduction was based on a lower tax-escrow requirement, despite the fact that Defendant TIAA claimed that Plaintiff's tax escrow was deficient. (Id.). In April 2013, Plaintiff's monthly payments increased to $1,445.21 per month. (FAC ¶ 32). Defendant TIAA sent correspondence to Plaintiff explaining that the increase in payment was because her tax escrow account was deficient by $2,670.82. (FAC ¶ 33). In 2014, Plaintiff's mortgage payments increased again to $1,524.96. (FAC ¶ 34).

Thereafter, Plaintiff received a letter on June 18, 2014 advising her that Defendant TIAA was transferring the servicing of her loan to Defendant Ditech. (FAC ¶ 35). Defendant Ditech contacted Plaintiff to advise that she was in default of her loan obligations. (FAC ¶ 37). Plaintiff contacted Defendants TIAA and Ditech to resolve the discrepancy and was told that the problem was told that she had a $3,000.00 tax escrow deficiency. (FAC ¶¶ 39-40). Additionally, Plaintiff was never provided with an explanation for the escrow deficiency. (FAC ¶ 46). Shortly thereafter, Defendant Ditech refused to accept payments from Plaintiff and returned to her $2,685.50. (FAC ¶¶ 48-49). Defendant Ditech then instituted a foreclosure action against Plaintiff in New Jersey State Court. (FAC ¶ 50). The matter was resolved on October 16, 2015, when the State Court dismissed Defendant Ditech's foreclosure complaint. (FAC ¶¶ 52-53).

On June 27, 2017, Plaintiff received a letter from Defendant Ditech advising that her loan was now being serviced by Defendant New Penn, doing business as Shellpoint. (FAC ¶ 60). That letter also advised Plaintiff that her monthly payment was $1,524.96. (FAC ¶ 61). Defendant New Penn sent Plaintiff a "Validation of Debt Notice" on June 29, 2017, which provided the following information: 1) the principal balance on the loan was $258,093.56; 2) the total amount of accrued unpaid interest was $23,298.48; 3) the escrow advances totaled $21,605.06; 4) a total amount of unpaid late fees and related charges was $4,123.53; 5) the total amount of the outstanding debt was $307,120.63; and 4) Defendant New Penn now owned the loan. (FAC ¶ 63). On July 5, 2017, Plaintiff sent Defendant New Penn a "Qualified Written Request/Notice of Error" indicating errors on her account pursuant to 12 U.S.C. § 2605(e)(1)(B) and a Validation of Debt notice pursuant to 15 U.S.C. § 1692g. (FAC ¶ 65). According to Plaintiff, these documents placed Defendant New Penn on notice that she was not in default and that the amount being sought against Plaintiff was wrong. (FAC ¶ 68).

Defendant New Penn, through its servicing arm Shellpoint, sent Plaintiff a mortgage statement on July 19, 2017. (FAC ¶ 73). Therein, Shellpoint explained the "contractual due date was June 1, 2014, and indicate[d] an amount due of $59,065.35," that Plaintiff had an escrow balance of $21,605.06, and a property inspection was conducted on July 10, 2017. (FAC ¶ 74). On August 8, 2017, Shellpoint sent Plaintiff a letter advising that it was conducting further investigation "due to the complex nature of the matter." (FAC ¶ 78). On August 9, 2017, Shellpoint responded to Plaintiff's Validation of Debt notice, wherein it reiterated the same information that Defendant Ditech had previously stated to Plaintiff. (FAC ¶ 79). On August 19, 2017, Shellpoint sent Plaintiff's counsel a mortgage statement which provided the following information: 1) Plaintiff's monthly mortgage payment was $1,679.14; 2) the total amount overdue at that time was $59,078.35; 3) the total amount due was $60,757.49; 4) the contractual due date was June 1, 2014; and 5) the escrow balance was $22,002.49. (FAC ¶¶ 82-83).

Said mortgage statement also advised that Shellpoint had paid Plaintiff's quarterly real estate taxes. (FAC ¶ 84). However, Plaintiff was paying her real estate taxes and property insurance directly to the responsible entities. (FAC ¶ 85). The mortgage statement also included the cost for the aforementioned property inspection. (FAC ¶ 86). On August 25, 2017, Shellpoint sent Plaintiff a Notice of Intent to Foreclose. (FAC ¶ 87). The Notice of Intent to Foreclose contained the following information: 1) the account was past due for failure to remit payment due on June 1, 2014; 2) Plaintiff had missed 39 payments resulting in an outstanding balance of $54,928.82; 3) Plaintiff had incurred late fees in the amount of $923.17; 4) Plaintiff was liable for attorneys' fees in the amount of $3,200.36; 5) Plaintiff was liable for $26.00 stemming from the property inspection; 6) Plaintiff's escrow balance was short $22,002.49; and 7) the total amount due at the time of the Notice of Intent to Foreclose was $59,078.35. (FAC ¶ 89).

Shellpoint sent an additional mortgage statement in September of 2017. (FAC ¶ 93). That mortgage statement provided the following: 1) Plaintiff's monthly payments were $1,679.14; 2) Plaintiff was liable for additional fees and charges in the amount of $103.08; 3) Plaintiff's overdue balance on the mortgage was now $60,770.49; 4) the total amount due at the time of the mortgage statement was $62,552.71; 5) Plaintiff incurred two additional late charges totaling $51.54; and 6) Plaintiff was liable for an inspection charge in the amount of $13.00. (FAC ¶ 94).

Against this backdrop, Plaintiff filed this action seeking to recover damages for the following causes of action: Count I – Violation of the Fair Debt Collection Practices Act ("FDCPA"); Count II – Violation of the Real Estate Settlement Procedures Act ("RESPA"); Count III – Breach of Contract; Count IV – Violation of the New Jersey Consumer Fraud Act ("NJCFA"); Count V – Violation of the Implied Covenant of Good Faith and Fair Dealing; Count VI – Intentional Infliction of Emotional Distress; and Count VII – Fraud. (FAC ¶¶ 97-214).

## II.  LEGAL STANDARD

To withstand a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

To determine the sufficiency of a complaint under *Twombly* and *Iqbal* in the Third Circuit, the court must take three steps: first, the court must take note of the elements a plaintiff must plead

to state a claim; second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth; finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief. *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (citations omitted). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

### III. ANALYSIS

#### A. FDCPA Claim[2]

"To prevail on an FDCPA claim, a plaintiff must prove that (1) she is a consumer, (2) the defendant is a debt collector, (3) the defendant's challenged practice involves an attempt to collect a 'debt' as the [FDCPA] defines it, and (4) the defendant has violated a provision of the FDCPA in attempting to collect the debt." *Douglass v. Convergent Outsourcing*, 765 F.3d 299, 303 (3d Cir. 2014) (citation omitted). The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e).

When Congress passed the legislation in 1977, it found that "[a]busive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and invasions of individual privacy." *Id.* § 1692(a). "As remedial legislation, the FDCPA must be broadly construed in order to give full effect to these purposes." *Caprio v. Healthcare*

---

[2] The Court notes that FAC does not contain any FDCPA allegations or claims against Defendant TIAA, and, therefore, this analysis is not applicable to it.

7

*Revenue Recovery Grp., LLC,* 709 F.3d 142, 148 (3d Cir. 2013). Accordingly, the Court must "analyze the communication giving rise to the FDCPA claim 'from the perspective of the least sophisticated debtor.'" *Kaymark v. Bank of Am., N.A.,* 783 F.3d 168, 174 (3d Cir. 2015) (quoting *Rosenau v. Unifund Corp.,* 539 F.3d 218, 221 (3d Cir. 2008)). "[W]hile the least sophisticated debtor standard protects naive consumers, 'it also prevents liability for bizarre or idiosyncratic interpretations of collection notices by preserving a quotient of reasonableness and *presuming a basic level of understanding and willingness to read with care.*'" *Brown v. Card Serv. Ctr.,* 464 F.3d 450, 454 (3d Cir. 2006) (quoting *Wilson v. Quadramed Corp.,* 225 F.3d 350, 354 (3d Cir. 2000)) (emphasis added). The Third Circuit has held that even the least sophisticated consumer is *"bound to read collection notices in their entirety."* *Compuzano-Burgos v. Midland Credit Mgmt., Inc.,* 550 F.3d 294, 298-99 (3d Cir. 2008) (emphasis added).

Here, Plaintiff has sufficiently alleged two of the four elements needed in order to assert a *prima facie* FDCPA claim. (FAC ¶¶ 98-99). However, Plaintiff fails to allege that the related "debt" is one that is covered under the FDCPA. (*See generally* FAC). Moreover, and more importantly, Plaintiff has failed to identify any violative conduct on behalf of Defendants.

According to Plaintiff, Defendants violated the FDCPA because the various correspondence she received from Defendants throughout the loan modification process were directly sent to her, despite having counsel, and contained "wrong" information. (FAC ¶ 100). For example, Plaintiff asserts the June 27, 2017 letter violated the FDCPA because it "falsely stat[ed] that the payment due date/default date [was] June 1, 2014, and that the monthly amount due for June 1, 2014 [was] $1,524.96. (FAC ¶ 100(a)(ii). Another example of Defendants' alleged FDCPA violations stems from July 1, 2017 correspondence, which, Plaintiff asserts, "provid[ed] false information in regard to the escrow balance and amount due." (FAC ¶ 100(c)(ii)). In total,

Plaintiff alleges that 14 pieces of Defendants' correspondence violated the FDCPA, but never actually explains what was wrong with the correspondences. (FAC ¶ 100).

The Court finds that Plaintiff has failed to state a *prima facie* FDCPA claim against any Defendant. First, the various correspondence sent to Plaintiff were done so pursuant to Federal and State laws and regulations. As Defendants Freddie Mac and New Penn correctly note, periodic billing statements must be sent to a borrower under the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et. seq.* TILA explicitly requires "[a] servicer ... [to] provide the consumer, for each billing cycle, a periodic statement" and that said statement contain specific information. 12 C.F.R. § 1026.41(d)(2)(i)(iii). Said statements must also include "the amount of the outstanding principal balances." *Id.*; *see also* 12 C.F.R. § 1026.41(d)(7)(i)-(ii). These period statements are mandatory under TILA. 12 C.F.R. § 1026.41. Defendants were also required, by New Jersey law, to send Plaintiff the Notice of Intent to Foreclose. *See* N.J.S.A. 2A:50-56. The Notice of Intent to Foreclose is also mandatory and must be given "30 days in advance of such action." N.J.S.A. 2A:50-56(a). Hence, Defendants cannot be liable for FDCPA violations for sending Plaintiff notices that they were required by law to send. *See Block v. Seneca Mortg. Servicing*, 221 F. Supp. 3d 559, 589-90 (D.N.J. 2016) (finding that a plaintiff's FDCPA claim could not lie when the basis for said claim was a legally required periodic mortgage statement).

Additionally, Plaintiff claims Defendants violated the FDCPA when they directly sent her correspondence, despite the fact that they knew she was represented by counsel in her previous foreclosure actions. (Compl. ¶ 100). First, Plaintiff never alleges that she was represented by counsel in connection with her loan modification efforts or any subsequent interactions with Defendants. Also, as Defendants correctly note, Plaintiff cannot sue for such conduct since it was her actions that prompted the correspondence from Defendants; *i.e.* Defendants sent Plaintiff

correspondence acknowledging receipt of her qualified written request, pursuant to 12 C.F.R. § 1024.36. (Compl. ¶¶ 100-04). This exact course of conduct has been rejected as a basis to assert FDCPA claims by Courts in this District. *See, e.g., Allen v. LaSalle Bank, N.A.*, 2012 WL 1898612 (D.N.J. May 23, 2012); *Cohen v. Am. Credit Bureau*, 2012 WL 847429 (D.N.J. Mr. 13, 2013); *see also Lee v. Thomas & Thomas*, 109 F.3d 302, 306-07 (6th Cir. 1997). Accordingly, the Court finds that Plaintiff's FDCPA claim must be dismissed as she has failed to plead that the subject "debt" is one that is covered by the FDCPA and has also failed to plead any violative conduct on Defendants' behalf.

### B. RESPA Claim

Count II of Plaintiff's FAC is brought under REPSA, and specifically pursuant to 12 U.S.C. § 2605(e)(3). (FAC ¶¶ 105-19). Therein, Plaintiff asserts that she sent Defendants a qualified written request, to which Defendants did not timely respond. (FAC ¶¶ 107-10). The section under which Plaintiff asserts her RESPA claim requires loan servicers to provide borrowers with the information they requested "or an explanation of why the information requested is unavailable or cannot be obtained by the servicer[.]" 12 U.S.C. § 2605(e)(2)(c)(i). However, a "*[f]ailure to plead actual damages in conjunction with a RESPA claim will result in its dismissal.*" *Oliver v. Bank of Am., N.A.*, 2014 2014 WL 562943, at *3 (D.N.J. Feb. 11, 2014) (citing *Mercado v. Bank of America*, 2012 WL 5629749, at *17-18 (D.N.J. Nov. 15, 2012)) (emphasis added).

Upon review of Plaintiff's FAC, the Court finds that Plaintiff's RESPA claim may not proceed. This is because Plaintiff has failed to plead *actual damages* in connection with the alleged RESPA violation. (*See generally* FAC ¶¶ 105-19). Rather, Plaintiff generally alleges that "[a]s a result of the action of Defendants, Plaintiff suffered damages." (FAC ¶ 116). These allegations are insufficient to meet the damages standard discussed in *Oliver*. Therefore, Plaintiff's RESPA

claim must be dismissed.

### C. Common Law Claims

Plaintiff's remaining claims are grounded in state law. (FAC ¶¶ 120-214). Specifically, the remaining claims are: Count III – Breach of Contract; Count IV – Violation of the NJCFA; Count V – Violation of the Implied Covenant of Good Faith and Fair Dealing; Count VI – Intentional Infliction of Emotional Distress; and Count VII – Fraud. (Id). Where a district court dismisses all claims over which it has original jurisdiction, it may, in its discretion, decline to exercise supplemental jurisdiction over the remaining state law claims. 28 U.S.C. § 1367(c)(3); *Elkadrawy v. Vanguard Grp., Inc.*, 584 F.3d 169, 174 (3d Cir. 2009). Because this Court has dismissed Counts I-II, over which it had original jurisdiction, it declines to exercise supplemental jurisdiction over Counts III–VII. As a result, this Court dismisses Counts III, IV, V, VI and VII for lack of subject matter jurisdiction.

### IV. CONCLUSION

For the aforementioned reasons, all of Defendants' Motions to Dismiss are granted. An appropriate Order accompanies this Opinion.

DATED: May 15, 2018

JOSE L. LINARES
Chief Judge, United States District Court

11